## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF LOUISIANA

EMILE FOLSE

*Plaintiff*

*v*
SYNGENTA CROP PROTECTION LLC
-and-
SYNGENTA AG
-and-
CHEVRON USA, INC.
-and-
CHEVRON PHILLIPS CHEMICAL
COMPANY LP

    *Defendants*

Case No.:

JURY TRIAL DEMANDED

---

## COMPLAINT

---

# TABLE OF CONTENTS

COMPLAINT .................................................................................................. 1

INTRODUCTION .......................................................................................... 3

PARTIES ....................................................................................................... 4

    A.    Plaintiff .............................................................................................. 4

    B.    Defendants ......................................................................................... 4

            1.  Syngenta Defendants ........................................... 8

            11. Chevron Defendants ............................................ 21

JURISDICTION & VENUE ........................................................................... 23

FACTS .......................................................................................................... 26

    A.    Overview of Paraquat ..................................................................... 26

    B.    History of Paraquat Development, Manufacture, Distribution, and Sale .......... 31

    C.    Overview of Parkinson's ................................................................. 33

    D.    Dangers of Paraquat ....................................................................... 34

    E.    Science Linking Paraquat to Parkinson's ........................................ 35

    F.    Regulation of Paraquat in the United States .................................... 37

    G.    Regulation of Paraquat Internationally ........................................... 40

    H.    Plaintiffs Use of Paraquat & Diagnosis of Parkinson's ................... 40

CAUSES OF ACTION .................................................................................. 42

    COUNT 1 - NEGLIGENCE ................................................................. 42

    COUNT 2 - MANUFACTURING AND DESIGN DEFECT UNDER RS 9:2800.55 AND LSA-RS 9:2800.56 ....................................................... 45

    COUNT 3 - INADEQUATE WARNING UNDER LSA-RS-9:2800.57 ......... 48

    COUNT 4 - NON-CONFORMITY TO EXPRESS WARRANTY UNDER LSA-RS- 9:2800.58 ..................................................................... 52

PRAYER FOR RELIEF ................................................................................ 54

JURY DEMAND ........................................................................................... 54

Plaintiff, Emile Folse, by and through undersigned counsel, brings this civil action for damages against Defendants Syngenta AG, Syngenta Crop Protection LLC, Chevron U.S.A. Inc., and Chevron Phillips Chemical Company LP, and alleges as follows:

## **INTRODUCTION**

1.      Paraquat, known as paraquat dichloride (EPA Chemical Code 06101) or paraquat methosulfate (EPA Chemical Compound 061602), is a synthetic chemical compound bearing EPA Chemical Code 06101 that since the early 1960s has been developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in certain herbicide products ("Paraquat Products") developed, registered, formulated, distributed, and sold for use in the United States under the brand names Starfire, Cyclone, Bonedry, Firestorm, Helmquat, Devour, Bonfire, Crisquat, Sweep, Blanco, Gramoxone, Ortho Paraquat CL, and Ortho Dual Paraquat, among others.

2.      Plaintiff brings this action against the Defendants to recover damages for personal injuries and other economic damages resulting from his exposure to Paraquat Products over many years at various places in the State of Louisiana, including Parishes within the Eastern District of Louisiana.

3.      Defendants are companies and successors-in-interest to companies that designed, manufactured, distributed, and sold Paraquat Products for use in Louisiana, and/or acted in concert with others who designed, manufactured, distributed, and sold Paraquat Products for use in Louisiana.

## **PARTIES**

A.  **Plaintiff**

4.      Plaintiff, Emile Folse, is a citizen and resident of the State of Louisiana

and the Parish of Terrebonne, who has suffered and continues to suffer from permanent

neurological injuries consistent with Parkinson's disease ("Parkinson's") caused by his

exposure to Paraquat Products at various places within the State of Louisiana generally,

and Parishes within the Eastern District of Louisiana, including Lafourche.

5.      Plaintiff used Defendants' Paraquat Products regularly and frequently over a

period of many years from 1980s until approximately 1998.

6.      Plaintiff suffers from Parkinson's caused by many years of regular, frequent,

prolonged exposure to Defendants' Paraquat Products.

**7.**      Plaintiff brings this case to recover from the Defendants the compensable damages

he has suffered which were directly and proximately caused by his exposure to  Defendants'

Paraquat Products.

B.  **Defendants**

8.      SYNGENTA CROP PROTECTION LLC is a Delaware limited liability company

with its principal place of business in Greensboro, North Carolina. SYNGENTA CROP

PROTECTION LLC is a subsidiary of Defendant SYNGENTA A G .

9.      SYNGENTA AG is a foreign corporation organized and existing under the laws

of Switzerland with its principal place of business in Basel, Switzerland.

10.      CHEVRON U.S.A., Inc. ("CHEVRON USA") is a Pennsylvania corporation with

its principal place of business in San Ramon, California. CHEVRON USA is an indirect

wholly owned subsidiary of CHEVRON CORPORATION.

11. CHEVRON PHILLIPS CHEMICAL COMPANY LP is a Delaware corporation with its principal place of business in The Woodlands, Texas. CHEVRON PHILLIPS CHEMICAL COMPANY LP is a subsidiary of CHEVRON PHILLIPS CHEMICAL COMPANYLLC.

12. CHEVRON PHILLIP CHEMICAL COMPANY LP and CHEVRON PHILLIPS CHEMICAL COMPANY LLC are collectively referred to as "CHEVRON PHILLIPS."

13. At times in this Complaint, SYNGENTA and SYNGENTA CROP PROTECTION LLC are collectively referred to as "SYNGENTA" or "SYNGENTA DEFENDANTS."

14. At times in this Complaint, CHEVRON USA, INC., CHEVRON PHILLIPS CHEMICAL COMPANY LP, are collectively referred to as "CHEVRON" or the "CHEVRON DEFENDANTS."

15. From approximately May 1964 through approximately June 1981, Imperial Chemical Industries Limited ("ICI Limited") and certain ICI Limited subsidiaries, each of which was a predecessor of Defendants SYNGENTA AG and/or SYNGENTA CROP, were engaged, directly, acting in concert with each other, and/or acting in concert with CHEVRON PHILLIPS, in the business of developing, registering, manufacturing, distributing, and selling paraquat for use as an active ingredient in Paraquat Products, and developing, registering, formulating, and distributing Paraquat Products, for sale and use in the U.S., including Louisiana ("the U.S. paraquat business").

16. From approximately June 1981 through approximately September 1986, Imperial Chemical Industries PLC ("ICI PLC") and certain ICI PLC subsidiaries, each of which was a predecessor of Defendant SYNGENTA AG and/or SYNGENTA CROP, were engaged ,

directly, acting in concert with each other, and/or acting in concert with Defendant CHEVRON PHILLIPS, in the business of developing, registering, manufacturing, distributing, and selling paraquat for use as an active ingredient in Paraquat Products, and developing, registering, formulating, and distributing Paraquat Products, for sale and use in the U.S., including Louisiana ("the U.S. paraquat business").

17. From approximately May 1964 through approximately September 1986, Chevron Chemical Company, a predecessor of Defendant CHEVRON USA was engaged, directly and/or acting in concert with ICI, in all aspects of the U.S. paraquat business.

18. Between approximately May 1964 and approximately September 1986, ICI manufactured and sold paraquat to CHEVRON DEFENDANTS ("!CI-CHEVRON paraquat") for use by Chevron Defendants, and others to which CHEVRON DEFENDANTS distributed it, as an active ingredient in Paraquat Products that Chevron Defendants and others formulated and distributed for sale and use in the U.S., including Louisiana ("!CI-CHEVRON Paraquat Products").

19. From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SYNGENTA CROP) initially, then other SYNGENTA AG predecessors and certain subsidiaries of each (including predecessors of SYNGENTA CROP), and most recently SYNGENTA AG and certain SYNGENTA AG subsidiaries (including SYNGENTA CROP), have been engaged, directly and/or acting in concert with each other, in all aspects of the U.S. paraquat business.

20. From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SYNGENTA CROP) initially, then other SYNGENTA AG predecessors and certain subsidiaries of each (including predecessors of SYNGENTA CROP), and most recently SYNGENTA AG and certain SYNGENTA AG

subsidiaries (including SYNGENTA CROP), have manufactured paraquat ("!Cl-SYNGENTA paraquat") for their own use, and for use by others to which they distributed it, as an active ingredient in Paraquat Products that SYNGENTA CROP and its predecessors and others have distributed for sale and use in the U.S., including Louisiana ("!Cl-SYNGENTA Paraquat Products")

### i. Syngenta Defendants

21.     In 1926, four British chemical companies merged to create the British company that then was known as Imperial Chemical Industries Ltd. and ultimately was known as Imperial Chemical Industries PLC ("ICI PLC").

22.     In or about 1971, ICI PLC created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which at various times was known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc.,and ultimately was known as ICI Americas Inc. (collectively, "ICI Americas").

23.     In or about 1992, ICI PLC merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, including the agrochemicals business it had operated at one time through a wholly owned British subsidiary known as Plant Protection Ltd. and later as a division within ICI PLC, into a wholly owned British subsidiary known as ICI Bioscience Ltd.

24.     In 1993, ICI PLC demerged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with the British company Zeneca Group PLC as its ultimate parent company.

25.     As a result of ICI PLC's demerger and creation of the Zeneca Group, ICI Bioscience Ltd. was demerged from ICI and merged into, renamed, or continued its business

under the same or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of Zeneca Group PLC.

26.     Before ICI PLC's demerger and creation of the Zeneca Group, ICI PLC had a Central Toxicology Laboratory that performed and hired others to perform health and safety studies that were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental Protection Agency ("EPA") to secure and maintain the registration of paraquat and other pesticides for use in the United States.

27.     As a result of ICI PLC's demerger and creation of the Zeneca Group, ICI PLC's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory.

28.     After ICI PLC's demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory continued to perform and hire others to perform health and safety studies that were submitted to EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

29.     As a result of ICI PLC's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI PLC and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the State of Delaware.

30.     In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company.

31.     As a result of the merger that created the Novartis Group, Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the State of New York, was merged into or continued its business under the same or similar

ownership and management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.

32. In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zenecawere wholly owned subsidiaries.

33. In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create the Syngenta Group, a global group of companies focused solely on agribusiness, with Defendant Syngenta AG as the ultimate parent company.

34. As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of SYNGENTA AG.

35. As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s CentralToxicology Laboratory.

36. Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire othersto perform health and safety studies for submission to the EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

37. As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their business under the same or similar ownership and management, as Syngenta Crop Protection,

Inc. ("SCPI"), a wholly owned subsidiary of SYNGENTA AG organized under the laws of the State of Delaware.

38.     In 2010, SCPI was converted into Defendant SYNGENTA CROP PROTECTION LLC, a subsidiary of SYNGENTA AG organized and existing under the laws of the State of Delaware with its principal place of business in Greensboro, North Carolina.

39.     SYNGENTA AG is a successor by merger or continuation of business to its corporate predecessor Novartis AG.

40.     SYNGENTA AG is a successor by merger or continuation of business to its corporate predecessor AstraZeneca PLC.

41.     SYNGENTA AG is a successor by merger or continuation of business to its corporate predecessor Zeneca Group PLC.

42.     SYNGENTA AG is a successor by merger or continuation of business to its corporate predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.

43.     SYNGENTA AG is a successor by merger or continuation of business to its corporate predecessor ICI Bioscience Ltd.

44.     SYNGENTA AG is a successor by merger or continuation of business to its corporate predecessor Plant Protection Ltd.

45.     SYNGENTA CROP is a successor by merger or continuation of business to its corporate predecessor SCPI.

46.     SYNGENTA CROP is a successor by merger or continuation of business to its corporate predecessor NCPI.

47.     SYNGENTA CROP is a successor by merger or continuation of business to its Corporate predecessors Ciba-Geigy Corporation.

48.     SYNGENTA CROP is a successor by merger or continuation of business to its corporate predecessor Zeneca Inc.

49.     SYNGENTA CROP is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc.

50.     SYNGENTA CROP is registered to do business in the State of Louisiana, with its registered agent office in Baton Rouge, Louisiana.

51.     SYNGENTA CROP does substantial business with respect to the Paraquat Products in the State of Louisiana, including Parishes within the Eastern District of Louisiana, including the following:

> a.   markets, advertises, distributes, sells, and delivers paraquat to distributors, dealers, applicators, and farmers in the State of Louisiana, including the Eastern District of Louisiana.
>
> b.   secures and maintains the registration of paraquat and other pesticides with the EPA and the Louisiana Department of Agriculture to enable itself and others to manufacture, distribute, sell, and use the Paraquat Products in the State of Louisiana, including Parishes within the Eastern District of Louisiana; and
>
> c.   performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of paraquat in the State of Louisiana, including Parishes within the Eastern District of Louisiana.

52.     SYNGENTA AG is a foreign corporation organized and existing under the laws

of Switzerland, with its principal place of business in Basel, Switzerland.

53.     SYNGENTA AG is a management holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SYNGENTA CROP.

54.     SYNGENTA CROP PROTECTION AG, a Swiss corporation with its principal place of business in Basel, Switzerland, is one of SYNGENTA AG's direct, wholly-owned subsidiaries.

55.     SYNGENTA CROP PROTECTION AG employs the global operational managers of production, distribution and marketing for the Syngenta Group's Crop Protection Division.

56.     SYNGENTA CROP PROTECTION AG is the "nerve center" through which SYNGENTA AG manages the entire Syngenta Group.

57.     SYNGENTA CROP PROTECTION AG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.

58.     SYNGENTA CROP PROTECTION AG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance.

59.     Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

60.     SYNGENTA AG is the indirect parent of SYNGENTA CROP through multiple layers of corporate ownership.

61.     Before SCPI was converted to SYNGENTA CROP, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of

directors.

62.     SYNGENTA CROP's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

63.     SYNGENTA AG has purposefully organized the Syngenta Group, including SYNGENTA CROP, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.

64.     Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SYNGENTA AG in fact exercises an unusually high degree of control over its country-specific business units, including SYNGENTA CROP, through a "matrix management" system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

65.     The lines of authority and control within the Syngenta Group do not follow its formal legal structure, but instead follow this global "functional" management structure.

66.     SYNGENTA AG controls the actions of its far-flung subsidiaries, including SYNGENTA CROP, through this global "functional" management structure.

67.     SYNGENTA AG's board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SPLLC.

68.     The SEC consists of the CEO and various global Heads, which currently are:

       a.   The Chief Executive Officer;

       b.   Group General Counsel;

     c.   The President of Global Crop Protection;

     d.   The Chief Financial Officer;

     e.   The President of Global Seeds; and

     f.   The Head of Human Resources;

69.     SIAG employs all of the members of the SEC.

70.     Global Syngenta Group corporate policies require SYNGENTA AG subsidiaries, including SPLLC, to operate under the direction and control of the SEC and other unincorporated global management teams.

71.     SYNGENTA AG's board of directors meets five to six times per year.

72.     By contrast, SCPI's board of directors rarely met, either in person or by telephone, and met only a handful of times over the last decade before SCPI became SYNGENTA CROP.

73.     Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from the SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI board members.

74.     Since SCPI became SYNGENTA CROP, decisions that are nominally made by the board or managers of SYNGENTA CROP in fact continue to be directed by the SEC or other Syngenta Group global or regional managers.

75.     Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the direction of the SEC or other Syngenta Group global or regional managers.

76.     Since SCPI became SYNGENTA CROP, the appointment and removal of the manager(s) of SYNGENTA CROP continues to be directed by the SEC or other Syngenta Group global or regional managers.

77.     The management structure of the Syngenta Group's CP Division, of which SYNGENTA CROP is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries.

78.     Atop the CP Division is the CP Leadership Team (or another body with a different name but substantially the same composition and functions), which includes the President of Global Crop Protection, the CP region Heads (including SYNGENTA CROP President Vern Hawkins), and various global corporate function Heads.

79.     The CP Leadership Team meets bi-monthly to develop strategy for new products, markets, and operational efficiencies and to monitor performance of the Syngenta Group's worldwide CP business.

80.     Under the CP Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but substantially the same composition and functions), which oversees the Syngenta Group's U.S. and Canadian CP business (and when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican CP business).

81.     The North America Regional Leadership Team is chaired by SYNGENTA CROP's president and includes employees of SYNGENTA CROP and the Syngenta Group's Canadian CP company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company).

82.     The Syngenta Group's U.S. and Canadian CP companies, including SYNGENTA CROP, report to the North America Regional Leadership Team, which reports to the CP Leadership Team, which reports to the SEC, which reports to SYNGENTA AG's board of directors.

83.     Some members of the North America Regional Leadership Team, including some SYNGENTA CROP employees, report or have in the past reported not to their nominal superiors within the companies that employ them, but directly to the Syngenta Group's global Heads.

84.     Syngenta Group global Heads that supervise SYNGENTA CROP employees participate and have in the past participated in the performance reviews of these employees and in setting their compensation.

85.     The Syngenta Group's functional reporting lines have resulted in employees of companies, including SYNGENTA CROP, reporting to officers of remote parent companies, officers of affiliates with no corporate relationship other than through SYNGENTA AG, or officers of subsidiary companies.

86.     SYNGENTA CROP performs its functions according to its role in the CP Division structure:

    a.  CP Division development projects are proposed at the global level, ranked and funded at the global level after input from functional entities such as the CP Leadership Team and the North America Regional Leadership Team, and given final approval by the SEC;

    b.  New CP products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions for the entire CP Division;

    c.  These products are then tested by other Syngenta Group companies, including SYNGENTA CROP, under the direction and supervision of the SEC, the CP Leadership Team, or other Syngenta Group global managers;

d. Syngenta Group companies, including SYNGENTA CROP, do not contract with or compensate each other for this testing;

e. Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

f. If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the target market is global or regional), not individual Syngenta Group companies such as SYNGENTA CROP, decide whether to sell the product;

g. Decisions to sell the product must be approved by the SEC;

h. The products that are sold all bear the same Syngenta trademark and logo.

87. SYNGENTA CROP is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SYNGENTA AG and applicable to all Syngenta Group companies.

88. These "reserved powers" require Syngenta Croup companies to seek approval for certain decisions from higher levels within the Syngenta Group's functional reporting structure.

89. For example, although SYNGENTA AG permits Syngenta Croup companies to handle small legal matters on their own, under the "reserved powers" system, SYNGENTA AG's Board of Directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including SYNGENTA CROP, if their value exceeds an amount specified in the "reserved powers."

90. Similarly, the appointments of senior managers at SYNGENTA CROP must be approved by higher levels than SYNGENTA CROP's own management, board of directors,

or even its direct legal owner.

91.     Although SYNGENTA CROP takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

92.     Although SYNGENTA AG subsidiaries, including SYNGENTA CROP, pay lip service to legal formalities that give the appearance of authority to act independently, in practice many of their acts are directed or pre-approved by the Syngenta Group's global management.

93.     SYNGENTA AG and the global management of the Syngenta Group restrict the authority of SYNGENTA CROP to act independently in areas including:

a.  Product development;

b.  Product testing (among other things, SYNGENTA AG and the global management of the Syngenta Group require SYNGENTA CROP to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or overseeproduct safety testing that SYNGENTA CROP submits to the EPA in supportof the registrations of paraquat and other pesticides);

c.  Production;

d.  Marketing;

e.  Sales;

f.  Human resources;

g.  Communications and public affairs;

h.  Corporate structure and ownership

1.  Asset sales and acquisitions

J.  Key appointments to boards, committees and management positions;

k. Compensation packages;

l. Training for high-level positions; and

m. Finance (including day-to-day cash management) and tax.

94.     Under the Syngenta Group's functional management system, global managers initiate and the global Head of Human Resources oversees international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.

95.     Under this international assignment program, at the insistence of Syngenta Group global managers, SYNGENTA CROP officers and employees have been "seconded" to work at other SYNGENTA AG subsidiaries, and officers and employees of other Syngenta Group subsidiaries have been "seconded" to work at SYNGENTA CROP.

96.     The Syngenta Group's functional management system includes a central global finance function-known as Syngenta Group Treasury-for the entire Syngenta Group.

97.     The finances of all Syngenta Group companies are governed by a global treasury policy that subordinates the financial interests of SYNGENTA AG's subsidiaries, including SYNGENTA CROP, to the interests of the Syngenta Group as a whole.

98.     Under the Syngenta Group's global treasury policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries such as SYNGENTA CROP, holds the cash on account, and lends it to other subsidiaries that need liquidity.

99.     The Syngenta Group's global treasury policy does not allow SYNGENTA AG subsidiaries such as SYNGENTA CROP to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.

100.    Syngenta Group Treasury also decides whether SYNGENTA CROP will issue a dividend or distribution to its direct parent company, and how much that dividend will be.

101.    SYNGENTA CROP's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

102.    SYNGENTA CROP does substantial business in the State of Louisiana, including Parishes within this United States District of Louisiana Court, and it markets, advertises, distributes, sells, and delivers Paraquat to users in the State of Louisiana, including Parishes within this District Court.

103.    SYNGENTA CORPORATION does substantial business in the State of Louisiana, including Parishes within this United States District of Louisiana Court, and it markets, advertises, distributes, sells, and delivers Paraquat to distributors, dealers, and end users in the State of Louisiana.

104.    SYNGENTA CROP PROTECTION LLC is registered to do business in the State of Louisiana, with its registered agent office in Baton Rouge, Louisiana.

105.    SYNGENTA CORPORATION is registered to do business in the State of Louisiana, with its registered agent office in Baton Rouge, Louisiana.

**ii.    Chevron Defendants**

106.    Chevron Chemical Company was a corporation organized in 1928 under the lawsof the State of Delaware.

107.    In 1997, Chevron Chemical Company was merged into Chevron Chemical Company LLC, a limited liability company organized under the laws of the State of Delaware.

108.    In 2000, Chevron Chemical Company LLC was merged into or continued to operateunder the same or similar ownership and management as Defendants CHEVRON PHILLIPS.

109.    Defendants CHEVRON PHILLIPS are successors by merger or continuation of business to their corporate predecessor Chevron Chemical Company.

110.    CHEVRON PHILLIPS LP is a partnership domiciled in Delaware, registered to do business in the State of Louisiana, with its registered agent office in Baton Rouge, Louisiana anda Principle Place of Business in Woodlands, Texas.

111.    CHEVRON PHILLIPS LLC is a corporation domiciled in Delaware, registered to do business in the State of Louisiana, with its registered agent office in Baton Rouge, Louisiana and a Principle Place of Business in Woodlands, Texas.

112.    CHEVRON PHILLIPS does substantial business in the State of Louisiana, including Parishes within this United States District of Louisiana venue, and it markets, advertises, distributes, sells, and delivers chemical and other products to distributors and end usersin the State of Louisiana.

113.    Defendant CHEVRON USA is a corporation domiciled in Delaware, organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in San Ramon, California.

114.    CHEVRON USA is registered to do business in Louisiana, with the office of its registered agent in Baton Rouge, Louisiana.

115.    Defendant PHILLIPS 66 COMPANY is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Houston, Texas.

116.    PHILLIPS 66 COMPANY is registered to do business in Louisiana, with the

office of its registered agent in Baton Rouge, Louisiana.

117.　PHILLIPS 66 COMPANY is a direct, wholly owned subsidiary of Defendant PHILLIPS 66.

118.　CHEVRON USA and PHILLIPS 66 COMPANY jointly own and control the operations of CHEVRON PHILLIPS.

119.　CHEVRON PHILLIPS is governed by a board of directors. Any decision by the board of directors must be approved by both CHEVRON USA and PHILLIPS 66 COMPANY

120.　CHEVRON USA is an indirect, wholly owned subsidiary of CHEVRON CORPORATION.

121.　In the mid-2000s, CHEVRON USA entered into an agreement in which it expressly assumed the liabilities of Chevron Chemical Company and Chevron Chemical Company LLC arising from Chevron Chemical's then-discontinued agrichemical business, which included the design, registration, manufacture, formulation, packaging, labeling, distribution, marketing, and sale of Paraquat Products in the United States as alleged in this Complaint.

122.　CHEVRON CORPORATION, PHILLIPS 66, CHEVRON USA, PHILLIPS 66 COMPANY, CHEVRON PHILLIPS LLC, and CHEVRON PHILLIPS LP operate under a contribution assumption agreement.

## JURISDICTION & VENUE

123.　This Court has subject matter jurisdiction over this action because diversity jurisdiction exists under 28 U.S.C. § 1332(a)(3).

124.　The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because Plaintiff seeks an amount that exceeds this sum or value on each of her claims against each Defendant.

125.  Complete diversity exists because this is an action between citizens of different states in which a citizen or subject of a foreign state is an additional party, in that:

    a.  Plaintiff is a citizen of the State of Louisiana;

    b.  SYNGENTA AG is a citizen of Switzerland;

    c.  SYGENTA CROP PROTECTION LLC is a citizen of the States of Delaware and North Carolina;

    d.  CHEVRON PHILLIPS CHEMICAL COMPANY LP is a citizen of the States of Delaware and Texas;

126.  This Court has personal jurisdiction over each of the Defendants in this diversity case because a state court in the State of Louisiana would have such jurisdiction under Louisiana Code§ 93-11-67, in that:

    a.  Over a period of two (Chevron) to six (Syngenta) decades, each Defendant and/or its predecessor(s), together with those with whom they were acting in concert, manufactured paraquat for use as an active ingredient in Paraquat Products, distributed paraquat to formulators of Paraquat Products, formulated Paraquat Products, marketed Paraquat Products to the Louisiana agricultural community, and/or distributed Paraquat Products, intending that such products regularly would be, and knowing they regularly were, sold and used in the State of Louisiana, and in fact were used by Plaintiff, all of which establishes a close relationship between thedefendants, the State of Louisiana, and this litigation;

    b.  Plaintiff's claims against each Defendant arise out of these contacts betweenthe Defendant and/or its predecessor(s), together with those

with whom they were acting in concert, with the State of Louisiana; and

c.  These contacts between each Defendant and/or its predecessors, together with those with whom they were acting in concert, and the State of Louisiana, were so regular, frequent, and sustained as to provide fair warning that it might be hauled into court there, such that requiring it to defend this action in the State of Louisiana does not offend traditional notions of fair play and substantial justice.

127.  Venue is proper in this district under 28 U.S.C. § 139l(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district, in that the claims arise from injuries caused by the exposure of Plaintiff ???????????to paraquat from Paraquat Products that were distributed and sold for use in this district,were purchased or purchased for use in this district, and were being used in this district when the exposures that caused the injuries occurred.

## FACTS

### A.  Overview of Paraquat

128.  Defendants' Paraquat Products have been used in the U.S. to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest. At allrelevant times, the use of Defendants' Paraquat Products for these purposes was intended or directed by or reasonably foreseeable to and was known to or foreseen by Defendants.

129.  Defendants' Paraquat Products were commonly used multiple times per year onthe same ground, particularly when used to control weeds in orchards and in farm fields wheremultiple crops are planted in the same growing season or year. At all relevant times,

the use ofDefendants' Paraquat Products in this manner was intended or directed by or reasonably foreseeable to, and was known to or foreseen by Defendants.

130.     Defendants' Paraquat Products were typically sold to end users in the form  of liquid concentrates that were then diluted with water in the tank of a sprayer and applied by spraying the diluted product onto target weeds. At all relevant times, the use of Defendants' Paraquat Products in this manner was intended or directed  by or reasonably foreseeable to, and was known to or foreseen by, the Defendants.

131.     Defendants' Paraquat Products were typically formulated with a surfactant or surfactants, and/or a surfactant, surfactant product, or "crop oil," which typically contains one or more surfactants, was commonly added  by  users of Defendants' Paraquat Products, to increase the ability of paraquat to stay in contact with and penetrate the leaves  of target  plants and enter plant cells. At all relevant times, the use of  Defendants'  Paraquat  Products  as  so  formulated and/or with such substances added was intended or directed by or reasonably foreseeable  to, and was known to or foreseen by the Defendants.

132.     Knapsack sprayers, hand-held sprayers, aircraft (i.e., crop dusters), trucks with attached  pressurized  tanks,  and  tractor-drawn  pressurized  tanks,  were  commonly  used  to apply Defendants' Paraquat Products. At all relevant times, the use of such equipment for that purposewas  intended  or  directed  by  or  reasonably  foreseeable  to,  and  was  known  to  or foreseen by, the Defendants.

133.     When Defendants' Paraquat Products were  used in a  manner that  was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, the Defendants, persons who used them and others nearby were commonly  exposed to  paraquat  while it  was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and

leaks. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by Defendants that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

134.    When Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants persons who sprayed them, and others nearby while they were being sprayed or when they recently had been sprayed, commonly were exposed to paraquat, including as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind) and contact with sprayed plants. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by Defendants that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

135.    When Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants, persons who used them and other persons nearby commonly were exposed to paraquat, includingas a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

136.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by

Defendants and people were exposed to paraquat as a result, paraquat could and did enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present, and that paraquat that entered the human body in one or more of these ways would and did create a substantial risk of harm to people so exposed.

137. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat could and did enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurs, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

138. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat could and did enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

139. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat that entered the human

body via ingestion into the digestive tract could and did enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract), and that paraquat that entered the enteric nervous system would and did create a substantial risk of harm to people so exposed.

140.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat that entered the human body, whether via absorption, respiration, or ingestion, could and did enter the bloodstream, and that paraquat that entered the bloodstream would and did create a substantial risk of harm to people so exposed.

141.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants, and people were exposed to paraquat as a result, paraquat that entered the bloodstream could and did enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier, and that paraquat that entered the brain would and did create a substantial risk of harm to people so exposed.

142.    At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat that entered the nose and nasal passages could and did enter the brain through the olfactory bulb (a part of the brain

involved in the sense of smell), which is not protected by the blood-brain barrier, and that paraquat that entered the olfactory bulb would and did create a substantial risk of harm to people so exposed.

143. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to Paraquat Products that contained surfactants or had surfactants added to them, the surfactants would and did increase the toxicity of paraquat toxicity to humans by increasing its ability to stay in contact with or penetrate cells and cellular structures, including but not limited to the skin, mucous membranes, and other epithelial and endothelial tissues, including tissues of the mouth, nose and nasal passages, trachea, conducting airways, lungs, gastrointestinal tract, blood-brain barrier, and neurons, and that this would and did increase the already substantial risk of harm to people so exposed.

**B. History of Paraquat Development, Manufacture, Distribution, and Sale**

144. ICI Limited, a predecessor company of Syngenta, discovered the herbicidal properties of paraquat in the mid-1950s; developed herbicide formulations containing paraquat as an active ingredient in the early 1960s; and produced the first commercial paraquat formulation, which it registered it in England and introduced in certain markets under the brand name GRAMOXONE®, in 1962.

145. ICI Limited was awarded a U.S. patent on herbicide formulations containing paraquat as an active ingredient in 1962.

146. In May 1964, ICI Limited, PP Limited, and the Chevron Defendants entered intoan agreement for the distribution of paraquat in the U.S. and the licensing of certain paraquat-

related patents, trade secrets, and other intellectual property ("paraquat licensing and distribution agreement").

147.    As a result of the May 1964 paraquat licensing and distribution agreement, paraquat became commercially available for use in the U.S. in or about 1965.

148.    In April 1975, ICI Limited, ICI US, and CHEVRON entered into a new paraquatlicensing and distribution agreement that superseded the May 1964 agreement.

149.    In November 1981, ICIA, CHEVRON, and ICI PLC entered into a new paraquat licensing and distribution agreement, effective January 1982, which superseded in part  and amended in part the April 1975 agreement.

150.    From approximately   May 1964 through approximately   September   1986, pursuant to these paraquat licensing  and  distribution  agreements, ICI and  CHEVRON  acted in concert in all aspects of the U.S. paraquat business.

151.    In September 1986, ICI and CHEVRON entered into an agreement terminating their paraquat licensing and distribution agreement.

152.    Under the September 1986 termination agreement, ICI paid CHEVRON for the early  termination  of  CHEVRON' s  rights  under  their  paraquat  licensing  and  distribution agreement.

153.    Although  the  September 1986  termination  agreement  gave  ICI  the  right  to buy,or exchange for ICI-labeled Paraquat Products, CHEVRON-labeled Paraquat Products that CHEVRON  had  already  sold  to  its  distributors,   CHEVRON-labeled  Paraquat   Products continued to be sold for use in the U.S. after this agreement for some period of time unknown to Plaintiff.

154.    SYNGENTA  AG,  SYNGENTA  AG's  predecessors,  and  subsidiaries  of

SYNGENTA AG and its predecessors (collectively, "SYNGENTA"), have at all relevant times manufactured more paraquat used as an active ingredient in Paraquat Products formulated and distributed for sale and use in the U.S., including Louisiana, than all other paraquat manufacturers combined.

155.    From the mid-1960s through at least 1986, SYNGENTA (as ICI) was the only manufacturer of paraquat used as an active ingredient in Paraquat Products formulated and distributed for sale and use in the U.S., including Louisiana.

156.    From approximately September 1986 through the present, SYNGENTA has:

  a. manufactured paraquat for use as an active ingredient in Paraquat Productsformulated and distributed for sale and use in the U.S., including Louisiana;

  b. distributed paraquat for use as an active ingredient in Paraquat Products formulated and distributed for sale and use in the U.S., including Louisiana;

  c. formulated Paraquat Products distributed for sale and use in the U.S.,including Louisiana; and

  d. distributed Paraquat Products for sale and use in the U.S., includingLouisiana.

## C.  Overview of Parkinson's

157.    Parkinson's disease is a progressive neurodegenerative disorder of the brain thataffects primarily the motor system, the part of the central nervous system that controls movement.

158.    Scientists who study Parkinson's disease generally agree that fewer than  10%

ofall Parkinson's disease cases are caused by inherited genetic mutations alone, and that more than90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

159.    The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

160.    Parkinson's disease's primary motor symptoms often result in "secondary" motorsymptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

161.    Non-motor symptoms-such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression-are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

162.    There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression, and the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

163.    The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc")is one of the primary pathophysiological hallmarks of Parkinson's disease.

164.    Dopamine is a neurotransmitter (a chemical messenger that transmits signals

from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

165.  The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

166.  Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

167.  The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

168.  Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

169.  Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in-if not the precipitating cause of-the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of Parkinson's disease.

### D.  Dangers of Paraquat

170.  Paraquat is highly toxic to both plants and animals because it causes and contributes to the degeneration and death of living cells.

171.  Paraquat causes and contributes to the degeneration and death of plant and animal cells both directly, through oxidation, and indirectly, through oxidative stress created or aggravated by the "redox cycling" of paraquat; these processes damage lipids, proteins, and

nucleic acids, molecules that are essential components of the structures and functions of living cells, and interfere with cellular functions-in plant cells, with photosynthesis, and in animal cells, with cellular respiration-that are essential to cellular health.

172. In both plant and animal cells, paraquat undergoes redox cycling that creates or aggravates oxidative stress because of the "redox properties" inherent in paraquat's chemical composition and structure: paraquat is both a strong oxidant and has a high propensity to undergo redox cycling, and to do so repeatedly, in the presence of a suitable reductant and molecular oxygen, both of which are present in all living cells.

173. The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can and often does initiate a cascading series of chemical reactions that can and often do create other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells.

174. Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical. After even a tiny amount of paraquat enters the human brain, paraquat molecules continue to undergo redox cycling and continue to cause damage to human brain cells. This repeated cycling continues in the presence of oxygenand continues to cause the death of dopaminergic neurons, eventually resulting in the onset of Parkinson's disease. However, even after the onset of Parkinson's disease, the redox cycling continues to cause brain cell damage and death for as long as the victim lives.

175. The oxidation and redox potentials of paraquat have been known to science since at least the 1930s, and in the exercise of ordinary care should have been known, and

were known, to Defendants at all relevant times.

176.     That paraquat is highly toxic to all living cells-both plant cells and all types of animal cells-has been known in the scientific community since at least the mid-1960s, and inthe exercise of ordinary care should have been known, and was known Defendants at all relevant times.

177.     The high toxicity of paraquat to living cells of all types creates a substantial risk of harm to persons exposed to paraquat, which Defendants should have known in the exercise of ordinary care, and did know, at all relevant times.

178.     The same oxidation and redox potentials that make paraquat highly toxic to plant cells and other types of animal cells make paraquat highly toxic to nerve cells, including dopaminergic neurons, and create a substantial risk of neurotoxic harm to persons exposed to paraquat. Defendants should have known this in the exercise of ordinary care, and did know this, at all relevant times.

### E.  Science Linking Paraquat to Parkinson's

179.     The same redox properties that make paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons. Paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons by creating oxidative stress through redox cycling.

180.     Although Parkinson's disease is not known to occur naturally in any species other than humans, Parkinson's disease research is often performed using "animal models," in which scientists artificially produce in laboratory animals conditions that show features characteristic of Parkinson's disease in humans.

181.     Paraquat is one of only a handful of toxins that scientists use to produce animal

models of Parkinson's disease.

182.    In animal models of Parkinson's disease, hundreds of studies involving various routes of exposure have found that paraquat causes the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's disease, and motor deficits and behavioral changes consistent with those commonly seen in human Parkinson's disease.

183.    Hundreds of in vitro studies (experiments in a test tube, culture dish, or other controlled experimental environment) have found that paraquat causes the degeneration and death of dopaminergic neurons.

184.    Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between paraquat exposure and Parkinson's disease, including multiple studies finding a two- to five-fold or greater increase in the risk of Parkinson's disease in populations with occupational exposure to paraquat compared to populations without such exposure.

185.    A population-based study of residents of rural California with historical pesticide use in the area published in 2009 concluded that "consumption of well water potentially contaminated with pesticides may play a role in the etiology of [Parkinson's disease]." Nicole M. Gatto et al. *Well-Water Consumption and Parkinson's Disease in Rural California,* 117 Envir. Health Perspective 1912 (2009).

186.    In another population-based study published in 2011, scientists further investigated the link between paraquat and Parkinson's. The authors stated "[o]ur findings, considered together with earlier results, suggest that paraquat use plays a role in human [Parkinson's]." Caroline M. Tanner et al., *Rotenone, Paraquat, and Parkinson's Disease,* 119

Environ. Health Perspectives 866 (2011).

187.    A 2017 study found that paraquat was associated with Parkinson's and that "paraquat exposure was found to impair mitochondrial respiration and increase mtDNA damage in in vivo and in vitro systems." Laurie H. Saunders et al., *Editor's Highlight: Base Excision Repair Variants and Pesticide Exposure Increase Parkinson's Disease,* 158 Tox. Science. 188 (2017).

### F. Regulation of Paraquat in the United States

188.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the United States, requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

189.    Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

190.    As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

191.    As a general rule, FIFRA requires registrants-not the EPA-to perform health and safety testing of pesticides, and the EPA generally does not perform such testing.

192.    The EPA registers (or re-registers) a pesticide if it believes, based largely on studiesand data submitted by the registrant, that:

a. its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A);

b. its labeling and other material required to be submitted comply with therequirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

c. it will perform its intended function without unreasonable adverse effects onthe environment, 7 U.S.C. § 136a(c)(5)(C); and

d. when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7

U.S.C. § 136a(c)(5)(D).

193. FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

194. Under FIFRA, "As long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(t)(2).

195. However, FIFRA further provides that "In no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(t)(2).

196. FIFRA further provides that "...it shall be unlawful for any person in any Stateto distribute or sell to any person... any pesticide which is... misbranded." 7 U.S.C. § 136j(a)(l)(E).

197. A pesticide is misbranded under FIFRA if, among other things:

a. its labeling bears any statement, design, or graphic representation relative

thereto or to its ingredients which is false or misleading in any particular, 7 U.S.C. § 136(q)(l)(A);

b. the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(l)(F); or

c. the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(l)(G).

198.    Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" underFIFRA.

199.    Plaintiff brings claims and seek relief in this action only under state law. Plaintiff does not bring any claims or seek any relief in this action under FIFRA.

### G.  Regulation of Paraquat Internationally

200.    Paraquat has been banned in more than 55 (fifty-five) countries across the world.

201. In July 2007, the European Union banned the use of Paraquat and found that Paraquat should not have been included on a list of approved substances because the evidence "fails to satisfy the requirement of protection of human and animal health." Court of First Instance of the European Communities, *Press Release No. 45/07, The Court of First Instance Annuls the Directive Authorizing Paraquat as an Active Plant Protection Substance* (July 11, 2007).

## H. Plaintiff's Use of Paraquat & Diagnosis of Parkinson's

202. Between approximately 1980 and 1998, Plaintiff Emile Folse was repeatedly exposed to and inhaled, ingested, or absorbed paraquat in the course of applying Paraquat Products, including Gramaxone. Plaintiff grew up and worked on his father's farm located in Lafourche Parish in Raceland on Bayou Folse, raising soy beans, sugar cane. Later, Plaintiff worked for the Parish of Lafourche as a Dragline Operator. He would spray approx. 200 acres with Paraquat.

203. Plaintiff would mix the chemicals in tanks and would spray them on water lilies and other vegetation.

204. On information and belief during this time period, Defendants manufactured and sold the paraquat that the owners or operators of farms and governmental entities applied or had applied on l a n d  i n and around Lafourche Parish, Louisiana.

205. After repeated and consistent paraquat exposure, Plaintiff began suffering neurological injuries consistent with Parkinson's disease and was diagnosed with Parkinson's disease in or about 2020. exhibiting some symptoms of the disease years earlier. Plaintiffs neurological injuries have continued and progressed over time, and Plaintiff suffers these injuries at present and will continue to suffer these injuries into the future.

206. Each of the Defendants knew or should have known of the risk of neurological

injuries to persons who used paraquat, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed and fraudulently concealed said risk.

207.    Before the year 2021, Plaintiff did not know nor had any reason to know of the association between Parkinson's disease and exposure to paraquat or Paraquat Products

208.    No doctor or any other person told Plaintiff before the year 2021 that his injurieswere or could have been caused by exposure to paraquat.

209.    Before the year 2021, Plaintiff had never read, viewed, or heard of any articles in newspapers, scientific journals, or other publications that associated Parkinson's disease with paraquat.

210.    Before the year 2021, Plaintiff had never read, viewed, or heard of any lawsuit alleging that paraquat causes Parkinson's disease.

211.    At no time when using paraquat himself was Plaintiff aware that exposure to paraquat could cause any latent injury, including any neurological injury or Parkinson's disease, or that any precautions were necessary to prevent any latent injury that could be caused by exposure to paraquat.

212.    The paraquat to which Plaintiff was exposed was sold and used in Louisiana, and was manufactured, distributed, and/or sold by one or more of the Defendants and  their corporate predecessors and others with whom they acted in concert intending or expecting that it would be sold and used in Louisiana.

213.    On information and belief, Plaintiff was exposed to Paraquat Products that weresold and used in Louisiana, and were designed, manufactured, distributed, and/or sold by the SYNGENTA DEFENDANTS, their corporate predecessors, and others with whom

they acted in concert, intending or expecting that it would be sold and used in Louisiana.

214.    On information and belief, Plaintiff was exposed to Paraquat Products that were sold and used in Louisiana, and were designed, manufactured, distributed, and/or sold by the CHEVRON DEFENDANTS, and others with whom they acted in concert, intending or expecting that it would be sold and used in Louisiana.

## CAUSES OF ACTION

## COUNT I. NEGLIGENCE

215.    Plaintiff repeats, reiterates, and re-alleges every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

216.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Paraquat into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

217.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Paraquat into interstate commerce in that Defendants knew or should have known that using Paraquat created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of PD, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

218.    The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a. Manufacturing, producing, promoting, formulating, creating, and/or designing Paraquat without thoroughly testing it;

b. Failing to test Paraquat and/or failing to adequately, sufficiently, and properly test Paraquat;

c. Not conducting sufficient testing programs to determine whether or not Paraquat was safe for use; in that Defendants herein knew or should have known that Paraquat was unsafe and unfit for use by reason of the dangers to its users;

d. Not conducting sufficient testing programs and studies to determine Paraquat's neurodegenerative properties even after Defendants had knowledge that Paraquat is, was, or could be neurodegenerative;

e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Paraquat, and the propensity of these ingredients to render Paraquat toxic, increase the toxicity of Paraquat, whether these ingredients are neurodegenerative , magnify the neurodegenerative properties of Paraquat, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f. Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Paraquat;

g. Negligently failing to petition the EPA to strengthen the warnings associated with Paraquat;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Paraquat;

i. Negligently marketing, advertising, and recommending the use of Paraquat without sufficient knowledge as to its dangerous propensities;

j.   Negligently representing that Paraquat had equivalent safety and efficacy as other forms of herbicides;

k.   Negligently designing Paraquat in a manner, which was dangerous to its users;

l.   Negligently manufacturing Paraquat in a manner, which was dangerous to its users;

m.   Negligently producing Paraquat in a manner, which was dangerous to its users;

n.   Negligently formulating Paraquat in a manner, which was dangerous to its users;

o.   Concealing information from the Plaintiff while knowing that Paraquat was unsafe, dangerous, and/or non-conforming with EPA regulations; and

p.   Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Paraquat compared to other forms of herbicides.

q.   Negligently selling Paraquat with a false and misleading label.

219.   Defendants under-reported, underestimated, and downplayed the serious dangers of Paraquat.

220.   Defendants negligently and deceptively compared the safety risks and/or dangers of Paraquat with common everyday foods such as table salt, and other forms of herbicides.

221.   Even though Defendants knew or should have known that Paraquat caused, or could cause, unreasonably dangerous side effects, Defendants continued and continues to market, manufacture, distribute, and/or sell Paraquat to consumers, including the Plaintiff.

222.   Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury due to Defendants' failure to exercise ordinary care, as set forth above.

223.   As a result of the foregoing acts and omissions, the Plaintiff suffered from serious

and dangerous side effects including, but not limited to, PD, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life-threatening PD, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

## COUNT II.  MANUFACTURING AND DESIGN DEFECT
## UNDER RS 9:2800.55 AND LSA-RS 9:2800.56 OF
## THE LOUISIANA PRODUCTS LIABLITY ACT (LPLA)

224.    Plaintiff repeats, reiterates, incorporates, and realleges every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

225.    Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, testing, advertisement, supply, promotion, packaging, sale, and distribution of Paraquat including the duty to take all reasonable steps necessary to manufacture and sell a product that was not defective and unreasonably dangerous to consumers and users of the product.

226.    Defendants failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of Paraquat because Defendants knew, or should have known, that exposure to Paraquat was linked to Parkinson's Disease, and was therefore not safe for use by consumers.

227.    Defendants continued to manufacture and market its product despite the knowledge, whether direct or ascertained with reasonable care, that Paraquat posed a serious risk of bodily harm to consumers.

228.    Defendants knew, or should have known, that consumers such as Plaintiff would foreseeably suffer injury because of Defendants' failure to exercise ordinary care. The

characteristic of the product that renders it unreasonably dangerous existed at the time the product left the control of Defendants.

229.     Paraquat was expected to, and did, reach the intended consumers, handlers, and persons coming in contact with the product with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Defendants.

230.     Paraquat was manufactured, designed, marketed, labeled and sold in a defective condition, for use by Plaintiff and all other consumers of the product, making the product unreasonably dangerous.

231.     Paraquat as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and formulation in that when it left the hands of the manufacturers, suppliers, and distributors, the foreseeable risks of harm caused by the product exceeded the claimed benefits of the product.

232.     Paraquat, as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and formulation because when it left the hands of Defendants, the product was unreasonably dangerous and was also more dangerous than expected by the ordinary consumer.

233.     At all times relevant to this action, Defendants knew and had reason to know that Paraquat was inherently defective and unreasonably dangerous as designed, formulated, and manufactured by Defendants, and when used and administered in the form manufactured and distributed by Defendants, and in the manner instructed by Defendants to be used by Plaintiff and other consumers.

234.     Plaintiff used Paraquat for the purpose intended by Defendants, and in a manner normally intended to be used. Defendants had a duty to design, create, and manufacture products

that were reasonably safe and not unreasonably dangerous for their normal, common, and intended use. Defendants' product was not reasonably fit, suitable, or safe for its anticipated use, and safer, reasonable alternative designs existed and could have been utilized. at the time the product left his control:

235.    In light of then-existing reasonably available scientific and technological knowledge, Defendants could have known of the design characteristic that caused the damage or the danger of such characteristic.

236.    Reasonably prudent manufacturers would not have placed the product in the stream of commerce with knowledge of these design flaws.

237.    Defendants designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product that created an unreasonable risk of serious harm to the health, safety, and well-being of Plaintiff and other consumers. Defendants is therefore liable for Plaintiff's injuries and damages sustained proximately caused by Plaintiff's use of the product, as Defendants' product unreasonably dangerous, and all damage arose from the reasonably anticipated use of the product by the Plaintiff.

238.    Plaintiff could not, by the exercise of reasonable care, discover the defective condition of Defendants' product and/or perceive its defective dangers prior to its use.

239.    Paraquat was a substantial, proximate, and contributing factor in causing Plaintiff's injuries.

240.    As a proximate result of Defendants' acts and omissions and Plaintiff's use of Defendants' defective product, Plaintiff suffered serious physical injuries and incurred substantial medical costs and expenses to treat and care for his injuries described in this Complaint, including, but not limited to, the following:

   a.   Plaintiff required and will continue to require healthcare and services;

b. Plaintiff incurred and will continue to incur medical and related expenses; and

c. Plaintiff suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

## COUNT III. INADEQUATE WARNING
## UNDER LSA-RS-9:2800.57

241. Plaintiff repeats, reiterates, incorporates, and realleges every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

242. Defendants designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed Paraquat.

243. Because it is unlawful to sell a pesticide that is registered but nevertheless misbranded, manufacturers have a continuing obligation to adhere to FIFRA's labeling requirements. 7 U.S.C. § 136j(a)(l)(E), § 136a(f)(2), § 136a(f)(l).

244. Paraquat was expected to, and did, reach the intended consumers, handlers, and persons not applying but exposed to the product in the course of its expected and foreseeable use, all with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Paraquat.

245. Paraquat was manufactured, designed, marketed, labeled and sold in a defective condition, for use by Plaintiff and all other consumers of the product, making the product unreasonably dangerous.

246. Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Paraquat and in the course of same, directly advertised or marketed the product to

consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of its product.

247. Paraquat, as designed, researched, developed, manufactured, tested, advertised, promoted, marketed, sold, labeled, and distributed by Defendants, was defective due to the product's inadequate warnings and instructions. Defendants knew, or should have known, and adequately warned that its product created a risk of serious and dangerous side effects, including but not limited to, Parkinson's Disease.

248. The product was under the exclusive control of Defendants and was unaccompanied by appropriate and adequate warnings regarding the risk of severe and permanent injuries associated with its use, including, but not limited to, the risk of developing Parkinson's Disease. The warnings given did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer.

249. Notwithstanding Defendants' knowledge of the defective condition of its product, Defendants failed to adequately warn the medical community and consumers of the product, including Plaintiff and his healthcare providers, of the dangers and risk of harm associated with the use of Paraquat.

250. Defendants downplayed the serious and dangerous side effects of its product to encourage sales of the product, particularly without the use of protective equipment; consequently, Defendants placed its profits above its customers' safety.

251. The product was defective when it left the possession of Defendants in that it contained insufficient warnings to alert Plaintiff to the dangerous risks associated with it, including the risk of Parkinson's Disease.

252. Even though Defendants knew or should have known of the risks and reactions associated with their product, it still failed to provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

253.     Plaintiff used Paraquat as intended or in a reasonably foreseeable manner.

254.     Each Defendant individually, as a manufacturer of agricultural products, is held to the level of knowledge of an expert in the field and, further, Defendants had knowledge of the dangerous risks and side effects of its product.

255.     Plaintiff did not have the same knowledge as Defendants and no adequate warning was communicated to Plaintiff or any other consumers.

256.     Defendants had a continuing duty to warn consumers, including Plaintiff, of the dangers associated with its product, and by negligently and/or wantonly failing to adequately warn of the dangers of the use of its product, Defendants breached its duty.

257.     Although Defendants knew, or should have known, of the defective nature of Paraquat it continued and continues to design, manufacture, market, and sell its product without providing adequate warnings and instructions concerning the use of its product so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by Paraquat.

258.     As a direct and proximate result of Defendants' failure to adequately warn or other acts and omissions of Defendants described herein, Plaintiff suffered severe and permanent injuries, pain, and mental anguish, including diminished enjoyment of life.

259.     Defendants' failure to warn extended beyond the product's label and into other media available to Defendants, including but not limited to advertisements, person-to-person sales calls, medical journal articles, and medical conference presentations.

260.     Paraquat, upon information and belief, as manufactured by Defendants, was further defective due to inadequate post-market warnings or instructions because after Defendants knew, or should have known, of the risk of serious bodily harm from the use of Paraquat, Defendants failed to provide adequate warnings to consumers about the product,

knowing the product could cause serious injury.

261.     Paraquat, upon information and belief, as manufactured and supplied by Defendants, was unreasonably dangerous because an adequate warning about the product was not been provided if, as at the time the product left Defendants' control, the product possessed the aforementioned characteristics that may cause damage users such as Plaintiff, and Defendants failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

262.     After Defendants had started shipping product that had left its control, Defendants acquired knowledge of characteristics of the product that might cause damage and the danger of such characteristic, and is liable for damage caused by a subsequent failure to use reasonablecare to provide an adequate warning of such characteristic and its danger to users and handlers ofthe product since that knowledge of the characteristics and its danger to users was acquired.

263.     A reasonably prudent manufacturer would have warned of these characteristics and its danger to users, and Defendants' failure to do so renders it liable for all damages caused by its subsequent failure to use reasonable care to provide adequate warning of the danger to Plaintiff and other users of the product.

264.     As a proximate result of Defendants' acts and omissions and Plaintiff's use of Paraquat, Defendants' defective product, Plaintiff suffered serious physical injuries and incurred substantial medical costs and expenses as set forth in this Complaint, including, but not limited to, the following:

> a.  Plaintiff required and will continue to require healthcare and services;
>
> b.  Plaintiff incurred and will continue to incur medical and related expenses; and
>
> c.  Plaintiff suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

## COUNT IV. NON-CONFORMITY TO EXPRESS WARRANTY
## UNDER LSA-RS-9:2800.58

265.     Plaintiff repeats, reiterates, incorporates, and realleges every allegation contained in this Complaint with the same force and effect as if fully set forth herein, Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

266.     At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling Paraquat Products and held themselves out as having knowledge or skill regarding Paraquat Products.

267.     At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold Paraquat Products intending or expecting that it would be sold and used in Louisiana.

268.     At the time of each sale of Paraquat Products to which Plaintiff was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert impliedly warranted that it was of merchantable quality, including that it was fit for the ordinary purposes for which such goods were used, when it was not of merchantable quality.

269.     Defendants, through their officers, directors, agents, representatives, and written literature and packaging, and written and media advertisements, expressly warranted that Paraquat was safe and effective and fit for use by consumers, was of merchantable quality, did not create the risk of or produce dangerous side effects, including, but not limited to, Parkinson's Disease and was adequately tested and fit for its intended use.

270.     Paraquat, as manufactured and sold by Defendants, did not conform to these representations because it caused serious injury, including Parkinson's Disease, to consumers such as Plaintiff, when used as directed by the product label.

271.     Defendants breached their express warranties because their product was and is defective for their intended purpose.

272.     Plaintiff did rely on Defendants' express warranties regarding the safety and efficacy of their product in purchasing and using the product, and induced Plaintiff to use the product, and Plaintiff's damages were proximately caused by the untruthfulness of the express warranty.

273.     As a foreseeable, direct, and proximate result of the breach of the express warranties, Plaintiff suffered severe and permanent personal injuries, harm, and economic loss.

## PRAYER FOR RELIEF

WHEREFORE, regarding each cause of action set forth above, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and causes of action and as follows:

274.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other noneconomic damages in an amount to be determined at trial of this action;

275.    Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff including health care costs and economic loss;

276.    Awarding Punitive damages for defendants' conduct;

277.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action

1.   Pre-judgment interest;

2.   Post-judgment interest;

3.   Awarding Plaintiff's reasonable attorneys' fees;

4.   Awarding Plaintiff the costs of these proceedings; and

5.   Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Respectfully submitted,

/s/ Betsy J. Barnes

Betsy Barnes, La. Bar 19473
Richard L. Root, La Bar 19988
Paul H. Villalobos La Bar22881
Morris Bart LLC
601 Poydras Street, 24th Floor
New Orleans LA 70130
P: (504) 525-8000
F: (833) 277-4214
bbarnes@morrisbart.com
rroot@morrisbart.com
pvillalobos@morrisbart.com